BAKER et. al. *vs.* LORILLARD.                [257]

By a will made in 1807, the testator devised " the use and improvement" of certain real estate to his grandson, with power to dispose of the same to the children or grandchildren of the devisee, and for want of such children or grandchildren the will directed that the estate should descend to the testator's son and to his heirs. By a subsequent clause, the testator disposed of other real estate as follows: " I give the use of my house No. 205 and No. 207, to my grandson, and then to his child or children, *as the other real estate is given.*" *Held,* that the grandson took a life estate, and not a fee tail, with remainder in fee to his children or grandchildren, and with an executory limitation over to the testator's son in case the grandson should leave no child (or grandchild) living at the time of his death.

*Held* further, that the first born child of the grandson took a vested remainder in fee subject to open and let in after-born children, (or grandchildren,) and subject to be defeated by the execution of the power of appointment among the children (or grandchildren) given by the will to the testator's grandson.

The grandson, after the birth of five children born to him since the death of the testator, applied to the court of chancery for authority to sell the estate in behalf of the children, and a sale was directed accordingly, and the grandson was authorized by the order to convey so as to bind all the interest of the children born or thereafter to be born, as well as all the contingent interest of the testator's son. A sale and conveyance were made pursuant to the order. *Held,* that the purchaser took a title which was defective for the reason that the grandson might survive his children and grandchildren, in which event the limitation over to the testator's son and his heirs would take effect, and for the further reason, that the grandson by executing the power of appointment might give the estate to grandchildren who were not parties to the proceeding

Whether a sale so made under the order of the court of chancery would bind the after born children of the grandson. *Quere.*

The jurisdiction of the court of chancery to order the sale of infants' real estate is derived wholly from the statute, and it has no power to direct such sale unless they are *seised* of the property.

But the court, it seems, may order the sale of a *vested remainder* belonging to infants.

Two tenants in common make partition of their lands and execute to each other releases in fee. One of them had only a life estate, but after the division the fee descends to him, and he subsequently sells and conveys in fee the part allotted to him in the partition. This, it seems, confirms the partition, so that he who held only the life estate can not claim any interest in the part allotted to his co-tenant.

THE bill was filed to compel the defendant to complete the purchase of certain real estate in the city of New-York, which the plaintiffs as executors of the will of William F. Baker [258]

had sold to him at auction, in March, 1845. The sale took place pursuant to an authority contained in the will of William F. Baker, and the premises in question were struck off to the defendant as the highest bidder. He refused to complete the purchase on the ground that the title was defective. The facts on which the question of title depended are these :

The premises in question, together with adjoining lands, were originally owned in fee by Elijah Pell and Thomas Pearsall as tenants in common. Pell died in 1798, leaving a will whereby he devised his share of the lands so held in common, to his daughter Mary C. Pell, " during her life and no longer, and after her death to her child or children should she leave any; if·more than one, to be equally divided between them share and share alike, to have and to hold to them, their heirs and assigns forever, in fee simple." By a subsequent clause in the will, the testator directed that in case his daughter " should die and leave no lawful issue," his executors or the survivors of them should sell the premises and distribute the proceeds among the relations of the testator in the manner specified. Mary C. Pell, in 1806, married Robert Macomb. They had issue, a daughter Julia, born in 1809, who died in 1831. The husband R. Macomb died in 1830. Mary C. is still living.

Thomas Pearsall, the co-tenant with Pell, also died in 1807, leaving a will whereby he gave to his grandson Duncan P. Campbell the " *use and improvement*," of various houses and lots, and among others the property which had been held by himself and Pell in common, with "full power and authority to make an equitable division" with the heirs of Pell. The will then proceeded as follows: " I give unto my grandson full power to dispose of the before mentioned real estate by will to any or either of his children if he shall leave any, or to his grandchildren, and for want of such child or children, the estate shall descend to my son [Thomas C. Pearsall] and his heirs." In a subsequent part of the will was the following clause : I give the use of houses No. 205 and 207 to my grandson and then to his child or children " *as the other real estate is given*." Thomas C. [259] Pearsall, the testator's son, died after the death of his

father, leaving a widow and several lawful children who are now living. The testator's grandson, Duncan P. Campbell, is still living and has eight children all living, three of whom were born subsequent to the sale of the premises under the order of the court of chancery as hereafter mentioned.

In the year 1809, a partition of the lands which had been so held in common by the testator Pell and Thomas Pearsall, was agreed on between the said Mary C. Pell and her husband Robert Macomb on the one side and the said Duncan P. Campbell and wife on the other. By that partition, the easterly half was set off to the said Macomb and wife, and the westerly half, being the premises in question, to the said Duncan P. Campbell. Mutual releases were executed according to this division, and each party entered upon and took and held possession of the premises allotted to them respectively.

The said Duncan P. Campbell afterwards, and in or about November, 1824, he then having five children, all minors, presented a petition to the chancellor, praying for a sale of the premises allotted to him on said partition, under the direction of the court, and thereupon an order was made referring it to a master to inquire and report concerning the facts set forth in the petition. The master reported favorably to a sale, and the court thereupon granted the prayer of the petition and directed a sale of the premises. The order of the court in terms, " authorized the said Duncan P. Campbell to sell and convey the premises absolutely and in fee simple, so that all the contingent and remote or other interest of his children born or thereafter to be born or the contingent and remote interest of the heirs of the said Thomas C. Pearsall, or derived from the will of said Thomas Pearsall, deceased, should be fully aliened and conveyed to the purchaser in fee simple absolutely and forever." It was further ordered that the purchase money of the premises should be invested by the register of the court in his name of office, and the interest paid to the said Duncan P. Campbell during his life, and after his death that the money should be disposed of as the court should direct. In pursuance of the order of sale the said Duncan P. Campbell together with [260]

Maria his wife sold and conveyed the premises in question in fee simple with full covenants unto William F. Baker, the testator of the plaintiffs in this cause. Baker entered into possession and improved the premises at great expense, and continued in possession until his death in 1835 ; and his heirs or devisees or the plaintiffs as executors under and by virtue of his will, continued in possession after his death until the sale to the defendant at auction heretofore mentioned. It also appeared that in the year 1840, the said Mary C. Pell, after the death of her husband Robert Macomb, and of her only child, sold and conveyed in fee simple to one Miller the land which had been allotted to them in the partition aforesaid.

The supreme court in the first district held upon these facts that the plaintiffs' testator, by the sale and conveyance to him from the said Duncan P. Campbell acquired a good and valid title, and that the defendant was bound to complete his purchase. A decree was made accordingly, from which the defendant appealed to this court.

*C. J. De Witt & Geo. Wood*, for appellant.

*S. F. Clarkson & C. O'Conor*, for respondents.

HARRIS, J. It is not pretended that Mrs. Macomb, when her release was executed upon the partition of the premises, had anything more than a life estate in the half of the premises devised to her. But it is insisted that having subsequently become entitled to the remainder in fee, as the heir at law of her only child, and having not only neglected to assert her subsequently acquired title to the premises, until it had become barred by the statute of limitations, but ratified the partition by her own subsequent acts and acquiescence, Campbell's title to the half of the premises, originally owned by Pell, has now become valid and indefeasible. The defendant, on the other hand, insists that by the executory limitation in the devise, Pell's share of the [261] premises, upon the death of Mrs. Macomb, "leaving no

lawful issue," would go over to the executors, to be disposed of by them, in the manner provided in the will.

The latter question has been judicially, and I think finally determined, in *Miller* v. *Macomb*, (26 *Wend.* 229.) It was the only question then before the court, and it was there decided first by the chancellor, and then by the unanimous judgment of the court for the correction of errors, that there was nothing in the will of Pell, to take the devise out of the technical rule of construction, which existed in this state and in England, previous to the change made by the revised statutes, that a limitation over, in the event of the death of the first taker, without leaving issue, meant an indefinite failure of issue, and not a failure of issue, at the time of the death of the first taker. It was accordingly held, that Mrs. Macomb, by the union of the life estate devised to her by the will, with the remainder in fee to which she had become entitled, as the heir at law of her daughter, had acquired an absolute and indefeasible estate of inheritance in fee simple, in the premises which had been allotted to her in the partition made with Campbell.

I have no reason to doubt the soundness of this decision, but whatever may be its merits, I agree with the court below, that it must be regarded as the law of this case. If there be anything valuable in the maxim, *stare decisis*, this is pre-eminently a case for its authoritative application. This court is the substitute and successor of the court of errors. It may, and undoubtedly ought, when satisfied that either itself, or its predecessor, has fallen into a mistake, to overrule its own error. I go farther, and hold it to be the duty of every judge and every court to examine its own decisions, and the decisions of other courts without fear, and to revise them without reluctance. But when a question has been well considered and deliberately determined, whatever might have been the views of the court before which the question is again brought, had it been *res nova*, it is not at liberty to disturb or unsettle such decision, unless impelled by " *the most cogent reasons.*" " I cannot legislate," said Lord Kenyon, " but by my industry I can discover what my predecessors have done, and I will tread in their footsteps." In the

[262] case before us, I have no doubt of the soundness of the construction which has been given to this particular devise, but I choose to put the decision exclusively upon the ground that it is no longer a question for judicial determination.

By the deed of partition, executed by Macomb and wife, in 1809, Campbell acquired the life estate of Mrs. Macomb in the premises. Upon the death of her daughter, in 1831, Mrs. Macomb inherited from her the remainder in fee of the same undivided half of the premises. Has that estate become vested in the owners of the other half? This is the next question to be considered.

Upon the partition being made, the parties each entered into the possession and enjoyment of the portion allotted to them, respectively, and neither has since claimed any interest in the premises held by the other. In 1840, Mrs. Macomb sold the premises allotted to her, and thus affirmed the validity of the partition. Having thus ratified the partition made by her when a *feme sole*, and when she was only entitled to a life estate, I think she is estopped from making any claim to the premises allotted to Campbell. Such a confirmation is at least equivalent to a partition by parol, which it has been often held, will, when accompanied by livery of seisin, bind tenants in common, holding under distinct titles. (4 *Kent's Com.* 369, *note* 6 ; *Ryers* v. *Wheeler*, 25 *Wend.* 434, *and cases there cited.*) The authority of Campbell to make a valid and effectual division of the lands held in common has not been questioned, and as Mrs. Macomb, after she became entitled to the whole estate, has taken the benefit of that division, it must also be held conclusive as to her, and those claiming under her. So far as this branch of the case is concerned, therefore, there is no valid objection to the plaintiff's title.

We are next to consider the title alledged to be derived from Pearsall. The sufficiency of this title depends, first, upon the construction to be given to the will, and then upon the effect of the sale under the order of the court of chancery.

Pearsall, by his will, gave to his grandson, Campbell, the "*use or improvement*" of various houses and lots, and among

the rest, the property "purchased by Pell and himself in [263] company," with full power and authority to make a fair and equitable division with the heirs of Pell. The will then proceeds as follows : " I give unto my grandson full power to dispose of the before mentioned real estate, by will, to any or either of his children, if he shall leave any, or to his grandchildren, and for want of such child or children, the estate shall descend to my son and his heirs." In a subsequent part of the will the following clause occurs : "I give the use of house No. 205 and 207 to my grandson, and then to his child, or children, *as the other real estate is given.*" What was the legal effect of this devise to Campbell and his children ? Did Campbell, by its operation, acquire an estate tail in the premises, to be converted, by means of the statute abolishing entails, into a fee simple; or did he take an estate for life, with remainder in fee to his children, subject to the exercise of the power of disposition by will, contained in the devise ? The former construction is maintained by the plaintiffs ; the latter by the defendant.

I am inclined to adopt the latter construction. The appropriate words for creating an estate tail are " heirs of the body" or " issue." The plaintiffs' counsel concedes that, in their primary sense, the terms " *children*" and " grandchildren" are words of purchase. They are used to describe, not the entire posterity, but a single generation of issue. Such words, says Hayes, " point not at heritable succession, but at individual acquisition." (*Hayes on Estates Tail, Elem. Essay,* 35.) But it is nevertheless true, that the words " heirs" and " issue" are, sometimes, used as words of purchase, and, on the other hand, the words "children" and "grandchildren" are, sometimes, used as words of limitation. There is no special virtue in either of these words, to make the estate devised one thing or the other. A testator may use either term to express the same thing ordinarily expressed by the other. But to justify a departure from the ordinary meaning of the terms, as established by the uniform course of legal interpretation, there must be the warrant of the testator himself, under his own hand. The context must testify that such a departure was intended. Such an intent, I

[264] have been unable, after an attentive examination of the language and provisions of this will, to find. To me, it seems very manifest, that the testator looked forward to the time of the death of his grandson, for whose benefit, primarily, the property was intended, as the period when the title should finally and absolutely vest. He gave the use of the property to his grandson, and "then to his child or children." He meant that Campbell should have the benefit of it, so long as it could be useful to him, and then, if he should die leaving descendants, that the property should vest in some or all of these. To this end he gave his grandson full power, by a testamentary disposition, to determine who, among his children, who might be living at the time of his death, should, and who should not, take the property. He was also authorized, in case he should die, leaving children, instead of giving the property to them, to give it to their children. He might discriminate between children and grandchildren, who should be living at the time of making the testamentary disposition, or passing by his children, he might give the property to his grandchildren generally. This I understand to be the import of the testator's language when he says, "I give unto my grandson full power to dispose of the before mentioned real estate by will, to any or either of his children, if he shall leave any, or to his grandchildren."

But Campbell was then young and unmarried. He might never marry. He might have no children, or his children might die before the period for them to take the property should arrive. These contingencies were not lost sight of by the testator. He therefore proceeds to declare, that in case his grandson should die, without leaving children or grandchildren to take the property, it should descend to his son Thomas C. Pearsall, and his heirs. Thus it was provided, that upon the death of Campbell, whatever else might happen, an absolute title to the property, in fee, should vest somewhere.

This being the construction of the will, I propose next to ascertain the legal effect of its provisions. Campbell, upon the death of the testator, took a life estate in the property. But in whom did the remainder vest? It must reside in somebody.

When Campbell took his life estate, somebody also took [265] the remainder in fee. Campbell, as yet, had no child to take it. Where then did the remainder go? Campbell's children, upon their coming into being, took no vested estate. The most that can be said is that they took a contingent remainder, limited upon the event of their surviving their father. This contingency, too, was further qualified by the testamentary power, conferred upon the father in the will. "There cannot be two legal fees in the same land," says the very learned writer from whom I have already quoted. "But it is clear that a *vested* remainder in fee, and a *contingent* disposition of that remainder, to take effect in a given event, may co-exist." (*Hayes' Essay,* 81.) Had things remained as they were, at the time of the testator's death, until the death of Campbell, it is beyond dispute that Thomas C. Pearsall, as the ulterior devisee, or, if dead, his heirs, would have taken the remainder in fee. I think such remainder vested in him, as such devisee, immediately upon the death of the testator. I think the legal effect of the will was to vest the remainder in fee in Thomas C. Pearsall, at the same time the life estate vested in Campbell—that such remainder vested, subject to its being *wholly divested,* upon the happening of the contingency upon which it would vest in the children or grandchildren of Campbell. That contingency is not, merely, the birth of such children. It includes survivorship also. A double contingency must happen, before the remainder vested in the ulterior devisee will be divested. Children must be born, and they must also survive their father. Of course, the latter event can not have happened, for Campbell is still alive. The remainder in fee still remains where it is vested úpon the death of the testator. It must remain so vested until both events shall have happened, which alone can divest it. As yet, no estate has ever vested in the children of Campbell, for a contingent remainder confers no estate at all. It is but the possibility of an estate.

If this view be adopted, it is impossible to sustain the plaintiff's title. By the deed from Campbell to Baker, the latter, of course, acquired the life estate of the former. But did he

[266] acquire any thing more? When the application was made to the court of chancery, for authority to sell the interest of Campbell's children, they had but the possibility of an estate. The legal title to the remainder in fee, expectant upon the life estate of Campbell, was vested in Thomas C. Pearsall, or his heirs. The event, upon which that title was to move to, and vest in, the children of Campbell, had not then, nor has it yet happened. To authorize the court of chancery to direct a sale, the infants must be *seised* of the property. (*Laws of* 1814, *p.* 128, § 1. 2 *R. S.* 194, § 170.) The only jurisdiction of the court is derived from the statute. (*Rogers v. Dill,* 6 *Hill,* 415.) I am inclined to think, therefore, that even in respect to such interest as the children had, at the time of the application to the court of chancery, it was not divested by the sale under the order of that court. They were not seised, and if not, the court acted without jurisdiction.

But suppose the court to have had authority to direct the sale, and that the effect of such sale was to cut off the interest of the children, on whose behalf the application was made, still another question arises, which is not without its difficulty, in relation to after-born children. If the effect of the will had been to vest in the children a remainder in fee, then I am inclined to think the sale would have divested the title of after-born children, as well as those in existence at the time the application was made. The doctrine seems to be, that if a life estate be devised to one, with remainder to his children, if there be a child in being at the death of the testator, the whole remainder in fee simple vests in such child, liable to be partially divested by the coming *in esse* of other children. If there be no child in being at the testator's death, but a child afterwards comes into existence, the same effect will *then* be produced, unless in the *interval* the owner of the life estate has done some act to determine prematurely his particular estate. This principle is distinctly laid down by Hayes, in his *second rule* for ascertaining the effect of a gift over, in default of issue, &c. p. 29. See also *Hannan v. Osborn,* (4 *Paige,* 336.) In such a case, the child in being, or coming into being, and taking a vested

remainder in fee, subject to open to let in the after-born [267] children, might be regarded, in some sense, as holding the legal estate, not only for its own benefit, but as the trustee of after-born children. If, therefore, the remainder in the premises in question had been vested in the children of Campbell, *in esse* at the time of the sale, I am inclined to think such sale might have carried with it the interest of the after-born children of Campbell, as well as the interest of those in being at the time. The 180th section of the statute, (2 *R. S.* 195,) which is the same as the 5th section of the act of 1815, page 104, and which declares that no sale made under that act shall give to the infant, on whose behalf the sale is made, any other or greater interest or estate in the proceeds of the sale, than he had in the estate sold, seems to look to a state of things where the whole title may be vested in the infant, and yet some other person may have some contingent or beneficial interest in it.

But let it be assumed that the sale under the order of the court of chancery operated to convey to Baker all the contingent interest which all or any of the children of Campbell had, or ever could have in the premises conveyed, there is yet another difficulty to overcome in making a perfect title to the property. Thomas C. Pearsall or his heirs had, if not a vested remainder, at least a contingent remainder in the premises. Though not very probable, it is quite possible, that Campbell may survive all his children and grandchildren, and if he does, the estate goes over to the heirs of Pearsall. It can not be pretended that this possibility has been in any way extinguished. The solicitor who conducted the proceedings in chancery, seems to have felt this difficulty. He was evidently embarrassed by the nature of the interests which he sought to have sold. Duncan P. Campbell, instead of the infants, was the petitioner. The petition, instead of stating in the language of the statute, that the infants were seised of the land, merely set forth the clause of the will, under which they acquired their interest. The reference directed an inquiry whether it would be " advantageous to the infant children of Duncan P. Campbell having *a contingent interest* in the premises, to sell the

[268] same." The master reported that the infant children of Campbell had no other property, and that under all the circumstances, he was of opinion that " a sale would be beneficial to the infant children, and most to their advantage, *if a good title should be given to the purchaser*." This unusual qualification of the master's opinion shows, that he too had some notion of the difficulty there might be in making a title. He further recommended that the proceeds of the sale should be placed at interest, for the benefit of the petitioner and his children, " *and such other persons as might be beneficially interested therein*." The order of the court goes still further, and directs Campbell to convey the property to the purchaser " absolutely and in fee simple forever, so that by such conveyance, *all the contingent or remote interest and other title or estate of his own children born or hereafter to be born, or the contingent or remote interest, or estate of any and all the heirs of the said Thomas C. Pearsall, deceased*," should be aliened and fully conveyed to the purchaser in fee simple, absolutely and forever. To execute such an order was certainly no easy matter. I think it was impossible. Yet Campbell undertook to do it. He accordingly executed his deed to Baker as the purchaser, by which, after reciting that he had himself a limited estate in the premises, that his children also had a contingent or remote interest, and that the heirs of Thomas C. Pearsall also had a contingent or remote interest, and after reciting the proceedings in chancery, he assumed to convey the premises, absolutely and in fee simple forever. Thomas C. Pearsall had then died. He left several children who are still living. Whether they were, at the time of the conveyance, adults or infants, does not appear. But whether they were the one or the other, it needs no argument to show that their interest in the premises could not be affected by such a grant. That interest, therefore, whatever it may be, remains undivested.

I do not deem it necessary to pursue this examination further. But I may suggest one other difficulty in respect to this title. The power of testamentary disposition, conferred by the will upon Campbell, is still operative. Suppose then, that in

the execution of that power, he should yet devise the [269] property, as by the will he may, to his grandchildren. Conceding now the jurisdiction of the court of chancery in the case, would the grant to Baker under the order of that court be an answer to the claim of the grandchildren under such a devise? I will not say that it would not. But I certainly can not say that it would.

I am free to admit that it has been with some degree of unwillingness that I have found myself shut up to these conclusions. I have sought, with all the earnestness consistent with a faithful application of well settled principles to the case in hand, to find some position which would justify an affirmance of this decree. The sale of the property to Baker was undoubtedly made in good faith, and for a fair price. The proceeds of the sale have, it seems, been expended upon other property held by the same parties, under the same tenure. I can not see that injustice could result to any one from a decree establishing the plaintiffs' title. But the difficulties that surround that title are so grave and so many, that I do not think the defendant ought to be compelled to complete his purchase. I am constrained, therefore, to vote for a reversal of the decree of the supreme court, and the dismissal of the plaintiffs' bill.

BRONSON, Ch. J. I agree with my brother Harris that the decree should be reversed, but can not follow in all the steps by which he has reached that result. As I read the will of Thomas Pearsall, having regard to the rules of law applicable to the case, the conclusions at which I have arrived are, that the testator gave an estate for life, not a fee tail, to Duncan P. Campbell; remainder in fee to the children, (or children and grandchildren—it is not important in this case to say which,) of Campbell; with an executory limitation over to the testator's son Thomas, in case Campbell should leave no child, (or grandchild,) living at the time of his death.

Campbell had power to appoint the estate in remainder to any one or more of his children to the exclusion of the rest; or to his grandchildren, if he should leave no children. The first

[270] born child of Campbell took a vested remainder in fee, subject to open and let in after-born children (and grandchildren ;) and subject to be defeated by the execution of the power of appointment.

The plaintiffs cannot give a good title to the land for several reasons.

1. Should Campbell survive all his children, (and grandchildren,) the estate in remainder will go to the testator's son Thomas, who was not a party to the sale in 1825.

2. The three children of Campbell who were not born at the time of the sale in 1825, were not, and could not be affected by that sale. (*Stat.* 1814, *p.* 116, *ch.* 108 ; *Id.* 1815, *p.* 103 ; 2 *R. S.* 194, § 170–180.)

3. The power of appointment may be so executed as to give the whole estate in remainder to a child who was not born at the time of the sale in 1825, or to grandchildren who were not parties to that proceeding.

A majority of my brethren concur in these views ; except that some of them choose to express no opinion on the question, whether the sale in 1825 binds all of the children of Campbell, or only such as were in being at that time.

We are all agreed that the decree should be reversed, and the bill be dismissed.

Ordered accordingly.